Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
David C. Wright (State Bar No. 177468)
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

[Additional counsel listed in signature block]

*Attorneys for Sheila Walder*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sheila Walder d/b/a Sheila's Mobile Spa & Sheilas Walder Mobile Sp, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>Banc of America Merchant Services, LLC, and Fiserv, Inc.,<br><br>Defendants. | Case No.  5:21-cv-1247<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Violation of California's Unfair Competition Law<br>2) Breach of Contract<br>3) Breach of Implied Covenant of Good Faith and Fair Dealing<br><br>**DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

1. Plaintiff Sheila Walder d/b/a Sheila's Mobile Spa and/or Sheilas Walder Mobile Sp ("Plaintiff" or "Walder") brings this lawsuit on behalf of herself and all others similarly situated against, Banc of America Merchant Services, LLC ("BAMS") and its successor FiServ, Inc. ("FiServ") (collectively, "Defendants"). In order to be able to accept credit cards and other non-cash methods of payments for her small mobile spa business, Plaintiff entered into a contract with BAMS. Under the terms of that contract, BAMS provided Plaintiff with a Clover point-of-sale credit card reader which enabled her to accept payment in a variety of ways including from credit and debit cards, checks and mobile wallets. Among other things, the contract with BAMS contains a fee schedule which purportedly sets forth the monthly and annual fees that BAMS could charge customers. In addition to the bevy of fees accompanying the use of the Clover machine, Plaintiff Walder brings this action because she was charged two different fees that were not disclosed under her contract: a monthly fee of $19.95 for Clover Security Plus, which was purported to ensure that her business transactions were compliant with applicable security standards, including PCI[1] security and *also* a monthly $20 fee, entitled "Non Receipt of PCI validation fee[2]" for not being compliant with applicable security standards. Upon information and belief, Defendants charged many other small business customers the same unauthorized monthly fees. As a result, Plaintiff and other members of the class incurred hundreds of dollars in onerous illegal monthly fees. Plaintiff seeks restitution, declaratory, and injunctive relief on behalf of herself and all others similarly situated. All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel. Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as well as Plaintiff's or counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity

---

[1] Described more fully below.
[2] Described more fully below.

for additional investigation or discovery.

2. BAMS—and later FiServ—provides merchant services to businesses, allowing these businesses to process credit and debit cards from these businesses' customers. On information and belief, BAMS purports to require every merchant customer to be compliant with PCI Data Security Standards ("PCIDSS"). PCIDSS are standards established by a conglomerate of credit card companies imposed upon merchants and banks that process, store, or transmit credit cardholder data. PCIDSS were purportedly established to protect cardholder data from security breaches.

3. Under the express terms of BAMS's Merchant Processing Application and Agreement ("Merchant Agreement"), BAMS requires merchants like Plaintiff to submit validation of their compliance with PCIDSS on or by August 1st of every year or otherwise face an *annual fee* of $40. However, instead of charging Plaintiff a one-time $40 as outlined in her Merchant Agreement, BAMS instead tacks a $20.00 fee *per month* for every month she has not validated her PCIDSS compliance—resulting in a $240 annualized fee vs. a $40 fee.

4. BAMS provides customers like Plaintiff little to no guidance on validating their PCIDSS compliance. Instead, merchants—many of whom are small business proprietors like Plaintiff—are left confused by the PCIDSS validation process, which is a multi-step process that includes a lengthy questionnaire riddled with technological terms of art.

5. BAMS charges merchant customers a monthly fee of $19.95 for Clover Security Plus—a supposedly "rapid comply" PCIDSS solution which "reduces risk and liability from potential security breaches while maintaining Payment Card Industry (PCI) Compliance. But paying this monthly fee does not stop BAMS from charging a PCI non-receipt or non-compliance fees nor does it help a non-compliant merchant become compliant.

6. Moreover, BAMS's PCI related fees bear no relation to security issues. Indeed, BAMS's merchant services monthly statements state nothing on how to get back

into compliance with PCI.  On information and belief, BAMS charges these fees to customers even where the PCI conglomerate has not fined BAMS for the customer's non-compliance.

7. BAMS's—and successor FiServ's—PCI non-receipt fees are in violation of the plain terms of Plaintiff's contract, which only allow a $40 annual or one-time fee for non-receipt and does not mention Clover Security Plus fees.  Moreover, Clover Security Plus and PCI non-receipt fees and Defendants' conduct surrounding them—*i.e.*, obfuscating the methods for its customers to get into compliance —are violations of the implied covenants of good faith and fair dealing which abound in any contract.  Last, Defendants' Security Plus and PCI non-receipt fees are violative under the unfair and fraudulent prongs of the Unfair Competition Law, Bus. and Prof. Code §§ 17200, *et seq.* ("UCL").

## II.    PARTIES

8. Plaintiff Sheila Walder is a resident of San Bernardino County, California. Plaintiff contracted with BAMS to enter into a Merchant Services Agreement through which she rented a Clover credit card reading device which allowed her to accept non-cash payments for her massage therapy business, Sheila's Mobile Spa, which is also known as Sheilas Walder Mobile Sp (*i.e.*, the business' name as it appeared on her account statements).  The contract with BAMS provided a list of all fees that Plaintiff could be charged under the agreement. Nonetheless, BAMS charged Plaintiff two monthly fees that were not authorized under the contract: A monthly Clover Security Plus Fee of $19.95 and a monthly Non-receipt of PCI validation fee of $20.  Plaintiff was charged these fees every month during the years 2019, 2020, and in 2021 up until she terminated her merchant account on or around February 10, 2021.  Upon information and belief, discovery will reveal more charges.

9. Defendant Banc of America Merchant Services, LLC is organized under Delaware law, with its headquarters in Charlotte, North Carolina.  Banc of America Merchant Services, LLC serves as the processor and provider of merchant services to

3

1  clients, such as Plaintiff. Banc of America Merchant Services, LLC was a joint venture
2  between Bank of America and First Data, Inc., which is now Fiserv, Inc.

3  10. Defendant Fiserv, Inc. is organized under Wisconsin law, with its
4  headquarters in Brookfield Wisconsin. Fiserv, Inc. is the owner of First Data, Inc. since
5  2019 and is also the owner of the Clover brand of point-of-sale credit card reader systems.
6  On or around July 2020, BAMS assigned Plaintiff's Merchant Agreement to FiServ. *See*
7  Bank of America, *Merchant Services FAQs*, *Banc of America Merchant Services, LLC*
8  *Joint Venture Transition*, https://www.bankofamerica.com/smallbusiness/merchant-
9  services/merchant-services-faq/ (noting that the merchant services contracts will be
10 assigned to FiServ or Bank of America).

11 11. There exists, and at all times herein mentioned existed, a unity of interest and
12 ownership between the named Defendants such that any corporate individuality and
13 separateness between the named defendants has ceased, and that the named defendants are
14 *alter egos* in that they effectively operate as a single enterprise or are mere
15 instrumentalities of one another.

16 12. At all material times herein, each defendant was the agent, servant, co-
17 conspirator, and/or employer of each of the remaining defendants; acted within the
18 purpose, scope, and course of said agency, service, conspiracy, and/or employment and
19 with the express and/or implied knowledge, permission, and consent of the remaining
20 defendants; and ratified and approved the acts of the other defendants. However, each of
21 these allegations are deemed alternative theories whenever not doing so would result in a
22 contradiction with the other allegations.

23 13. Whenever reference is made in this Complaint to any act, deed, or conduct of
24 a defendant, the allegation means that the defendant engaged in the act, deed, or conduct
25 by or through one or more of its officers, directors, agents, employees, or representatives
26 who was actively engaged in the management, direction, control, or transaction of the
27 defendant's ordinary business and affairs.

28 14. As to the conduct alleged herein, each act was authorized, ratified, or directed

by Defendants' officers, directors, or managing agents.

## III. JURISDICTION AND VENUE

15. This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which at least one Class Member is a citizen of a state different from the citizenship of Defendants.

16. Venue is proper in this District because Plaintiff transacted with Defendants, and Defendants executed their unlawful policies and practices, which are the subject of this action, in this District.

## IV. SUBSTANTIVE ALLEGATIONS

### A. PCIDSS Background

17. PCIDSS are technical and operational standards set by the PCIDSS Council to protect cardholder data. PCI Security Standards Council, *PCI Quick Reference Guide*, https://www.pcisecuritystandards.org/pdfs/pci_ssc_quick_guide.pdf (last visited May 10, 2021). These standards apply to all organizations that store cardholder data. *Id.* However, these standards are industry standards—they do not carry the force of law.

18. To validate PCIDSS compliance, the following steps must be taken:

- Determine which self-assessment questionnaire ("SAQ") the business should use to validate compliance. The SAQ varies by the type of merchant answering the questionnaire (*e.g.*, transaction volume, credit cards taken, the method transactions occur), as shown in the chart below.

CLASS ACTION COMPLAINT

| Processing Method | Description | SAQ |
|---|---|---|
| Shopping Cart - Entire Internet Presence Outsourced | Your customers enter their credit card information into a website to make online purchases, payments, or donations. All e-commerce pages including all payments acceptance and processing are delivered directly from a 3rd party PCI-validated service provider. | A |
| Shopping Cart - Payment Page Entirely Outsourced | During the payment process, the consumer's browser is redirected to a checkout/payment page (URL or iFrame) that is entirely controlled entirely by a PCI-compliant 3rd party service provider. | A |
| Shopping Cart - Payment Page Partially Outsourced | During payment process, the consumer's browser is redirected to a checkout/payment page (URL or iFrame) that is controlled by a PCI-compliant 3rd party service provider, BUT some elements (javascript, CSS, etc.) are passed from the merchant page to the 3rd party payment page. | A-EP |
| Shopping Cart - Payment Page Direct Post | During payment process, the checkout/payment page directly posts payment information from the merchant website to a 3rd party service provider, but the page resides on the merchant website. | A-EP |
| Shopping Cart - Payment Page Not Outsourced | During the payment process, the consumer enters credit card information on a checkout/payment page that is part of the merchant website. | D-Merchant |
| POS Terminal | You are using POS (Point of Sale) software installed on a computer or other device. Computers with POS software are often combined with devices such as cash registers, bar code readers, printers, optical scanners, and card readers. In addition, POS systems typically have functionality beyond just payment processing, such as inventory management, and are usually designed for a specific business sector (e.g. restaurants, hospitality, gyms, grocery stores, etc.) | C |
| Virtual Terminal – Manual Entry | You use a web browser on a computer or mobile device to access a merchant services site for entering and authorizing credit card purchases. You should have a username and password and be able to access the site from any online computer. You never swipe the card, but instead use a keyboard or keypad to manually type in the credit card information. | C-VT |
| Virtual Terminal – Card Reader | You have a card reader connected to your computer that reads the card information and enters it into the virtual terminal. | C |

- Assuming a merchant can guess which SAQ they take, the merchant must then complete the SAQ.
- Depending on the type of merchant, complete and obtain evidence of a

6
CLASS ACTION COMPLAINT

passing vulnerability scan with a PCI SSC Approved Scanning Vendor. Again, this requires determining which type of processing method the merchant uses in the above chart.

- Complete the relevant Attestation of compliance in its entirety (located in the SAQ tool).
- Submit the SAQ, evidence of a passing scan (if applicable), and the Attestation of compliance, along with any other requested documentation, to your acquirer, *i.e.*, the processing bank.

*See* PCIComplianceGuide.org, *PCI FAQs*, https://www.pcicomplianceguide.org/faq/ (last visited May 14, 2021).

19. The SAQs are not simple questionnaires. Instead, they are lengthy documents riddled with technical jargon, such as "Does your company use a Qualified Integrator & Reseller (QIR)?",[3] "Is inbound Internet traffic limited to IP addresses within the DMZ?",[4] and "Does penetration testing to verify segmentation controls meet the following [requirements]?".[5]

20. PCIDSS also imposes upon acquirers, *i.e.*, banks like BAMS, responsibilities regarding PCIDSS compliance. Banks are "responsible for building a PCI compliance program." Mastercard, *What acquirers need to know about managing PCI compliance*, https://www.mastercard.us/en-us/business/overview/safety-and-security/security-recommendations/site-data-protection-PCI/acquirers-need-to-know.html (last visited May 11, 2021). "Acquirers . . . are ultimately responsible for their merchants' compliance." PCIDSS Guidance, *Common Acquirer Responsibilities*, http://www.pcidssguidance.com/pci-background/common-acquirer-responsibilities/ (Feb. 28, 2016).

---

[3] https://www.pcisecuritystandards.org/documents/PCI-DSS-v3_2_1-SAQ-A.pdf?agreement=true&time=1620745316551
[4] https://www.pcisecuritystandards.org/documents/PCI-DSS-v3_2_1-SAQ-D_Merchant.pdf?agreement=true&time=1620745316689
[5] https://www.pcisecuritystandards.org/documents/PCI-DSS-v3_2_1-SAQ-B_IP.pdf?agreement=true&time=1620747451282

### B. Defendants' Unlawful PCI Non-receipt Fees

21. Defendants provide merchant services to their customers. Among other things, this service provides Plaintiff and other customers a leased Clover machine, allowing merchants to accept credit and debit cards from their customers. This service is lucrative for Defendants—merchant services providers like Defendants reap significant fees, including various processing fees, rental fees, and transaction fees.

22. As part of this service, Defendants require their merchant customers to comply with PCIDSS. On information and belief, under the terms of the Merchant Agreement, BAMS states it will charge a $40 supplemental fee if merchants do not submit validation of their PCI compliance. The fee itself serves no other purpose but to line Defendants' pockets.

23. To make matters worse, BAMS goes beyond the once-a-year $40 supplemental fee outlined in the merchant agreement. Specifically, the Merchant Agreement states, "If we have not received validation of your PCI compliance by the August 1st following the first 12 months of processing with us or each August 1st thereafter, you will be charged *a separate $40 supplemental fee* ("Supplemental Fee") or if an *Annual Maintenance Fee applies, it will be increased by the Supplemental Fee amount*." Despite this clear language, Defendants charge $20 per month instead of a $40 per year fee—resulting in $240 vs. $40 in PCI non-receipt fees, or $200 profit outside the scope of the contract.

24. Defendants' PCI non-receipt fee is also particularly egregious because it was at the same time charging Plaintiff a $19.95 Clover Security Plus fee. FiServ—Clover's owner—touts that this security feature "[r]educe[s] risk and liability from potential breaches *while maintaining Payment Card Industry (PCI) compliance*," *and* it is a "*PCI Rapid Comply Solution*." https://www.clover.com/get-paid/security. Yet, this fee does nothing of the sort since paying this purported PCI "[r]apid [c]omply" feature fee *does not prevent* PCI non-receipt fees, where BAMS charges customers the contradictory PCI non-receipt fee.

8

CLASS ACTION COMPLAINT

25. Despite the payment of the monthly Clover Security Plus fee, Plaintiff was charged PCI non-compliance fees and was provided no assistance in becoming PCI compliant. Her monthly merchant services statements contained *no direction whatsoever* about how to get into compliance, and she received no communications from BAMS or Fiserv about the issue, or any other help to get into compliance. Indeed, given the complicated process detailed above and Defendants' lack of guidance, it is clear that Defendants would rather profit off their plain breach of their contracts with their merchant customers than guide them to validating PCIDSS compliance, and thus, ensuring Defendants' own compliance as an acquirer under the PCIDSS.

26. Accordingly, Defendants' monthly Clover Security Plus and PCI non-receipt fees are in plain violation of the terms of Defendants' Merchant Agreement. As well, by leaving the customer in the dark with how to remedy the PCI non-receipt fee in Plaintiff's bills, as well as charging certain customers an additional Clover Security Plus fee, Defendants are breaching the implied covenant of good faith and fair dealing implied in its contracts. Last, Defendants' failure to disclose these fees violates both the unfair and fraudulent prongs of the UCL.

27. Indeed, BAMS' fee is particularly egregious in light of allegations that BAMS itself was not PCIDSS compliant. A recent whistleblower lawsuit alleges, *inter alia*, that BAMS was mishandling customer primary account number data, or "PAN data," potentially exposing such data to a potentially devastating security breach. *See* Complaint, *Slawin v. Bank of America Merchant Services*, No. 1:19-cv-04129-AT (N.D. Ga.), ECF No. 1. Specifically beginning in 2017—while Plaintiff was a BAMS customer—the BAMS whistleblower flagged to BAMS that BAMS was mishandling PAN data by sending it through potentially hackable email data. *Id.* at ¶54. Ironically, one senior BAMS executive allegedly responded to the whistleblower that becoming PCI compliant with respect to PAN data was "very costly and time consuming." *Id.* at ¶57.

28. Although Plaintiff originally contracted with BAMS, FiServ was assigned Plaintiff's Merchant Agreement on or around July 2020. *See* Bank of America, *Merchant*

*Services FAQs*, Banc of America Merchant Services, LLC Joint Venture Transition, https://www.bankofamerica.com/smallbusiness/merchant-services/merchant-services-faq/ (noting that the merchant services contracts will be assigned to FiServ or Bank of America).  FiServ continued to bill Plaintiff the monthly non-receipt fee.  Accordingly, FiServ also violated the Merchant Agreement, the implied covenant of good faith and fair dealing, as well as the unfair and fraudulent prongs of the UCL.

### C.   Plaintiff's Experience

29.    Plaintiff Sheila Walder became a BAMS merchant customer in or around March 2013 when she began renting a Clover credit card reader from BAMS.  On numerous occasions, Defendants charged Plaintiff a recurring $19.95 Clover Security Plus fee and a recurring $20 PCI non-receipt fee, including every month for the years 2019, and 2020, up until she terminated her merchant account with assignee FiServ in February 2021.  Plaintiff has incurred *more* than $518.70 in extra-contractual Clover Security Plus fees.  Also, Plaintiff has incurred $480 in PCI non-receipt fees, as opposed to $80, the amount she should have been charged for noncompliance according to her BAMS contract.  Further review of Defendants' records will provide the information necessary to calculate the full extent of Plaintiffs' damages.  At a minimum, Plaintiff has been damaged by *at least* $918.

## V.   CLASS ACTION ALLEGATIONS

30.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

31.    Plaintiff brings this case, and each of the respective causes of action, as a class action.

32.    The "Class" is composed of one of the following:

**Nationwide Class:**

**All merchants service customers charged a monthly PCI non-receipt fee and/or Clover Security Plus fee within the applicable statute of limitations to the present.  Following discovery, this definition will be amended as appropriate.**

**California Sub-Class:**

CLASS ACTION COMPLAINT

**All Defendants' merchants charged a monthly PCI non-receipt fee in the four-years preceding this suit to the present. Following discovery, this definition will be amended as appropriate.**

33. Excluded from the Class are: 1) any entity in which Defendants have a controlling interest; 2) officers or directors of Defendants; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

34. This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

35. **Numerosity** – Upon information and belief, the members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the plethora of online complaints that the Class is numerous.

36. Upon information and belief, Defendants have databases, and/or other documentation, of consumers' redemption attempts. These databases and/or documents can be analyzed by an expert to ascertain which of Defendants' merchant customers have been harmed by Defendants' practices and thus qualify as a Class Member. Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

37. **Commonality** –This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether Defendants required merchant customers to comply with PCIDSS;
- Whether Defendants charged Plaintiff and other Class Members Clover Security Plus fees that were not contemplated in their merchant services contracts;

- Whether, in charging Plaintiff and other Class Members Clover Security Plus fees, Defendants breached the terms and conditions of their contracts;
- Whether Defendants charged Plaintiff and other Class Members PCI non-receipt fees;
- Whether, in charging Plaintiff and other Class Members PCI non-receipt fees, Defendants breached the terms and conditions of their contracts;
- Whether, in charging Plaintiff and other Class Members Clover Security Plus fees and PCI non-receipt fees, Defendants breached the implied covenant of good faith and fair dealing;
- Whether, in charging Plaintiff and other Class Members Clover Security Plus fees and PCI non-receipt fees, Defendants violated the UCL; and
- Whether Defendants continue to violate the UCL and breach the terms and conditions of their contracts by continuing to charge PCI non-receipt fees.

38. **Typicality** – Plaintiff's claims are typical of all Class Members. Upon information and belief, the evidence and the legal theories regarding Defendants' alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the fees charged by Defendants affects all of the Class Members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

39. **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation, and specifically consumer class action cases to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and counsel intend to prosecute this action vigorously.

40. **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual

Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendants' wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendants' violations of law to proceed without remedy and allowing Defendants to retain the proceeds of their ill-gotten gains.

41.   Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class.  This particular forum is desirable for this litigation because the claims arose from activities that occurred largely therein.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

42. Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, Defendants' own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

43. This matter is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or
- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

44. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;
- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;
- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Violation of the UCL, Cal. Bus. & Prof. Code § 17200 Against All Defendants)**

45. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein. This cause of action is alleged alternatively and cumulatively.

46. Defendants' conduct described herein violates California's UCL, Bus. & Prof. Code § 17200, *et seq*. The UCL prohibits and provides civil remedies for unlawful and unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits claims under any of these three prongs. Here, Defendants' conduct violates the unfair and fraudulent prongs of the UCL.

47. The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose. A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an unfair competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair competition in violation of the statutory scheme, or restitution to victims of the unfair competition.

48. Under the unfair prong, the UCL includes within its scope acts and practices not specifically proscribed by any other law. Defendants' conduct with respect to charging PCI non-receipt fees is unfair because on balance, Defendants' practice substantially injures Defendants' merchant customers by charging those customers Clover Security Plus fees and PCI non-receipt fees without providing any information to obtain validation while Defendants retain these profits and such injury is not reasonably avoidable nor outweighed by any countervailing benefits to the customer.

49. Defendants' practices also constitute a fraudulent business practice

proscribed by the UCL.  As alleged herein, Defendants charged Plaintiff and the class undisclosed Clover Security Plus fees which purportedly ensured compliance with PCI security standards, but which did nothing of the kind.  As alleged herein, Defendants misrepresented the PCI non-receipt fees as a one-time $40 fee to be incurred by merchants who do not submit their yearly validation of their PCI compliance to Defendants.  In fact, Defendants charged merchant customers $20 per month, resulting in a $200 ill-gotten windfall.  Defendants' misrepresentation resulted in damages to Plaintiff and the Class.

50. Accordingly, Defendants have violated the UCL.  As a direct and proximate result of Defendant's violations of the UCL, Plaintiff and Class Members have paid violative PCI non-receipt fees while Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of Section 17200 described in this Complaint.  Consequently, Plaintiff and the Class thus ask this Court to issue an injunction preventing Defendants from continuing their violative practices *vis-à-vis* Plaintiff, the Class, and future customers, and to award Plaintiff and the Class equitable relief, restitution, civil penalties, punitive damages, attorney fees, consequential damages, and all other damages available at law.

51. Further, absent injunctive relief forcing Defendants to disgorge themselves of their ill-gotten gains and public injunctive relief prohibiting Defendants from charging undisclosed duplicative fees at issue in this action in the future, Plaintiff and other existing members, and the general public, will suffer from and be exposed to Defendants' conduct violative of the UCL.

52. Plaintiff requests that they be awarded all other relief as may be available by law, pursuant to California Business & Professions Code § 17203, including an order of this Court compelling Defendants to cease all future unlawful and unfair business practices.

## SECOND CAUSE OF ACTION
### (Breach of Contract as Against All Defendants)

53. The preceding allegations are incorporated by reference and re-alleged as if

fully set forth herein.

54. Plaintiff and the Class entered into the Merchant Agreements with Defendants.

55. Defendants' Merchant Agreement does not provide for a Clover Security Plus fee.

56. As alleged herein, Defendants violated the terms of their contract by charging Plaintiff such a fee.

57. Defendants' Merchant Agreement contractually limited PCI non-receipt fees to a one-time $40 supplemental fee.

58. As alleged herein, Defendants violated this term by charging a recurring $20 monthly PCI non-receipt fee. Thus, Defendants are in material breach of the terms and conditions of the Merchant Agreement, depriving Plaintiff of the benefit of the bargain.

59. As a consequence of Defendants' breach, Plaintiff and other similarly situated members of the Class have suffered direct and consequential damages to be determined in accordance with proof at the time of trial, for which Defendants are liable.

## THIRD CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing as Against All Defendants)**

60. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

61. As alleged herein, Plaintiff—as well as each Class member—entered into a contract with Defendants that limited PCI non-receipt fees to a one-time $40 fee. The primary purpose of this contract was to encourage customers to comply with PCIDSS, while Defendants provide merchant services to customers. The covenant of good faith and fair dealing is implied into this contract.

62. By charging a recurring monthly $19.95 Clover Security Plus fee and a recurring monthly $20 PCI non-receipt fee, with no information on how to validate

17
CLASS ACTION COMPLAINT

PCIDSS compliance, Defendants have frustrated the primary purposes of the contract and denied Plaintiff and the Class the benefits conferred to them by Defendants' terms and conditions.

63. In so charging the Clover Security Plus fee and the PCI non-receipt fees, Defendants have not acted fairly and in good faith.

64. As a consequence of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and other similarly situated members of the Class have suffered direct and consequential damages to be determined in accordance with proof at the time of trial, for which Defendants are liable.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1. For an order certifying this action as a class action;
2. For compensatory damages on all applicable claims and in an amount to be proven at trial;
3. For an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;
4. For statutory damages;
5. For punitive damages;
6. For restitution;
7. For civil penalties;
8. For an order enjoining Defendants from continuing the wrongful conduct alleged herein;
9. For costs;
10. For pre-judgment and post-judgment interest as provided by law;
11. For attorneys' fees under the common fund doctrine, and all other applicable law; and
12. For such other relief as the Court deems just and proper.

| | | |
|---|---|---|
| Dated: July 27, 2021 | By: | */s/ Richard D. McCune*<br>Richard D. McCune, CA Bar No. 132124<br>rdm@mccunewright.com<br>David C. Wright, Esq., CA Bar No. 177468<br>dcw@mccunewright.com<br>**McCune Wright Arevalo, LLP**<br>3281 East Guasti Road, Suite 100<br>Ontario, CA 91761<br>Telephone: (909) 557-1250<br>Facsimile:  (909) 557-1275 |
| | | Elaine S. Kusel*<br>esk@mccunewright.com<br>**McCune Wright Arevalo, LLP**<br>One Gateway Center, Suite 2600<br>Newark, NJ 07102<br>Telephone: (909) 557-1250<br>Facsimile:  (909) 557-1275 |

*\*Pro hac vice* motion to be filed

*Attorneys for Plaintiff Sheila Walder and the Putative Class*

### DEMAND FOR JURY TRIAL

Plaintiff and the Class demand a trial by jury on all issues so triable.

Dated: July 27, 2021                                   */s/ Richard D. McCune*
                                                                      Richard D. McCune, CA Bar No. 132124

CLASS ACTION COMPLAINT